**WILLIAMSON DAILY NEWS v.
LINOGRAPH CO.**

No. 3040.

Circuit Court of Appeals, Fourth Circuit.

Feb. 12, 1931.

Ben Moore and T. C. Townsend, both of Charleston, W. Va. (Harry Scherr, of Huntington, W. Va., on the brief), for appellant.

George S. Wallace, of Huntington, W. Va. (James W. Bollinger, of Davenport, Iowa, on the brief), for appellee.

Before PARKER, Circuit Judge, and SOPER and COLEMAN, District Judges.

WILLIAM C. COLEMAN, District Judge.

This is an appeal from a decree in equity in favor of the appellee, the Linograph Company, a corporation engaged in the manufacture of typesetting machinery, with its principal place of business in Davenport, Iowa, which was the plaintiff below and will hereinafter be called the seller, against the appellant, the Williamson Daily News, a corporation engaged in the newspaper publishing business in Williamson, W. Va., which was the defendant below and is hereinafter called the purchaser. The suit was brought by the seller to recover the balance due on the sale of two typesetting machines and their equipment, and to foreclose on two chattel mortgages covering the property sold. Only one of the machines, that known as linograph model 12, is now in controversy. The decree of the lower court awarded the seller $7,044.53, which represented the total unpaid balances together with accrued interest. The purchaser admitted having bought the machines and equipment as alleged by the seller, but sought to avoid payment by a counterclaim alleging breach of warranty with respect to the model 12 machine. The contract price of this machine was $5,600, and of its equipment $1,367, a total of $6,967. The purchaser paid on account $3,835, including an allowance of $2,000 for an old machine. The balance, $3,132

with interest, making a total of $4,197.92, is the amount which the lower court decreed to the seller, in addition to $2,846.61 found to be due on the purchase price of the other machine, plus interest. With this latter amount, we are not here concerned except as it is involved in the purchaser's counterclaim, because the purchaser has accepted the second machine as satisfactory. It claims, however, that because the model 12 machine was defective, it should not have been required to pay anything more under the contract, but that a decree should have been entered in its favor for $460.92, representing the amount paid on account, namely, $3,835, less the contract price of the equipment and of the other machine, with interest, the model 12 machine to be returned to the seller.

There are nine assignments of error, but they all bear upon the same question, namely, the validity of defendant's counterclaim, which in turn, depends upon the answers to the three following questions: (1) What was the nature and extent of the warranty that went with the model 12 machine? (2) Was this warranty breached by defects in that machine, thereby entitling the purchaser to rescind the contract? and (3) Was the right, if any, to rescind waived, either expressly or impliedly, by the purchaser?

The agreement of sale covering the model 12 machine is contained in a written contract consisting of an order from the purchaser, signed by three of its officers, its president, its editor and manager, and also by a salesman, and accepted on behalf of the seller by its sales manager, the contract providing that it should become binding when so signed. This acceptance is dated May 26, 1924, at Davenport, Iowa. Thus, the contract having been consummated in Iowa, its provisions are to be interpreted according to the law of that state. Scudder v. Union National Bank, 91 U. S. 406, 23 L. Ed. 245; Gaston v. Warner, 260 U. S. 201, 43 S. Ct. 18, 67 L. Ed. 210. The contract provided for certain cash payments, the balance by a series of monthly notes, secured by a chattel mortgage on the property sold, and also contained the three following provisions which are pertinent to the present suit: "The Linograph Company guarantees the Linograph to be of good mechanical construction and agrees to replace any parts which prove defective, provided the broken parts are returned to the factory for inspection with transportation charges prepaid." "The Linograph Company does not bind itself to any verbal agreements or 'understandings' not specified in contract." "The Linograph Company agrees to send a man to install the Linograph and to allow him to stay with the purchaser for five days, for the purpose of giving instruction in the operation and care of the Linograph."

In July, 1924, the seller's employee Ziegler installed the machine, tested it out in operation, and then turned it over to the purchaser and received the latter's so-called "installation O. K." in writing, signed by its editor, on July 31, 1924. Thereupon the purchaser's operator Blackburn ran the machine and appears to have had trouble from the very beginning, which Ziegler, in September, was called in to remedy and did remedy, operating the machine himself for ten days. During that time the president of the company told him that the trouble was not due to any fault in the machine, but to the operator's fault. The machine was a linograph as distinguished from a linotype machine, designed primarily for so-called display composition, which permits of a smaller average of line-setting per day than does ordinary straight composition, due to the fact that there is a greater variety in size of type and length of line. The trouble found by Ziegler was that the machine did not produce the proper quantity of work, due primarily to two alleged defects: First, the letters on the left-hand side of the keyboard fell into the assembly elevator faster than the letters on the right, resulting in transposition of letters and the consequent necessity of discarding whole lines in which these transpositions occurred; second, certain parts of the machine failed to maintain a constant clearance, with the result that the mechanism sometimes became blocked. Blackburn stated the trouble was due to a tendency "to squirt," which in the printing trade is understood to be the throwing of molten metal over the front and back of the machine, thus requiring frequent cleaning of the type, with consequent loss of time in operation. The seller's engineer and factory inspector testified that he refused to O. K. the machine when it left the factory, because its magazine was too wide and its construction too light to perform what was expected of it; that it was not capable of reasonably efficient operation as a typesetting machine. He stated that he did so over the protest of the manager and secretary of the company, but he never saw the machine after it was installed, and was discharged by the company in October, 1925. It appears that several other machines of the same type, sold to other customers, also produced un-

satisfactory results. The seller's sales manager testified that only twelve of this type were manufactured, and four were still in successful operation, the company having stopped making this type because of patent litigation.

In October, 1924, Ziegler left the seller's employment and became superintendent of the purchaser's plant where he became operator of the machine in the place of Blackburn. In November, 1924, purchaser had bought the other so-called intertype machine from the seller, and had given to the seller the following letter commendatory of the Model 12 machine:

"Williamson Daily News, Inc.
"John J. Jasper, Editor
"Williamson, West Virginia
"Nov. 18, 1924.
"The Linograph Company, Davenport, Iowa.
"Gentlemen: Your representative, Mr. W. H. Needham has asked us to write you stating our opinion of the Model 12 Linograph. Our Model 12 has been in operation now for near six [?] months, running two shifts a day and has proved the best investment we have put into our plant. We set about one-half our straight matter on it and all of the display in our eight page daily.

"The model 12 has enabled us to dress up our paper and put it on a par with the metropolitan papers as far as appearance and makeup are considered. We set our display almost as fast as we do our body letter and the changes from one face to another are so rapidly made that the time thus saved is proving a valuable asset to us. Where we formerly were forced to hand-set all matter above fourteen point we now set everything up to and including thirty-six point Chelt. on the Model 12.

"We are so pleased with the performance of our Model 12 that we are glad of this opportunity to say a good word (for) the machine. We cannot recommend it too highly for speed, accuracy and efficiency in operation. We can recommend Model 12 to anyone in the market for a versatile machine—one carrying both display and body matter.
"Very truly yours,
"The Williamson Daily News, Inc.,
"By John J. Jasper, Editor."

During the month of January, 1925, the purchaser's company was sold to new interests and a reorganization in the management took place, but Ziegler was retained as operator of the model 12 machine until the latter part of February, 1925, when he was again employed by the seller, up to which time, that is, for some seven months, the machine worked satisfactorily, except for minor troubles. During nearly all of this period the purchaser paid its monthly notes with interest as they became due under the contract of sale, and made no complaints about the machine. Mr. Adams, the new business manager, on January 27, 1925, wrote the seller the following letter:

"Williamson Daily News
"Williamson, West Virginia.
"1/27/25
"The Linograph Co., Davenport, Iowa.
"Gentlemen: At the request of your Mr. Needham, we are writing you in order to inform you regarding the notes which are due on the Machine purchased sometime ago.

"The Williamson News, has been purchased by new owners, and the business of the concern is in the process of change and reorganization. The delay in meeting your notes is caused by a missing check that we were informed, was written, taking care of one of the notes; for which we can find no record. It will be only a matter of a few days until we will be able to get this proposition straightened out.

"The new owners are the proprietors of the Wheeling News, and the Parkersburg Sentinel, and there need be no worry concerning their ability to pay. The future notes and obligations will be taken care of as they arise.
"Thanking you for your patience, we are,
"Very truly yours,
"Williamson Daily News
"[Signed] Virgil L. Adams, Business Mgr."

For some eight months thereafter, that is, until September, 1925, the purchaser continued to pay its installment notes with interest and made no complaint whatsoever respecting the machine. However, on October 5, 1925, the purchaser caused its attorney to send the following letter to the seller:

"Oct. 5, 1925.
"The Linograph Company, Davenport, Ia.
"Gentlemen: In Re: Williamson Daily News, Williamson, W. Va. I have been requested by the Williamson Daily News of this City, to advise you that the News finds it impossible to use Linograph Model 12, No. 5018, purchased from you some months ago.

"This machine has never given satisfaction, and has been a constant source of trouble since its purchase. Because of this fact the Company has found it necessary to purchase another machine to do the work the

Linograph purchased from your company should have done. The poor construction of the machine purchased from your Company, has caused the machine to be out of working order a great part of the time, causing the Daily News a great financial loss in numerous ways.

"This letter is therefore to advise you, that the Daily News has ceased to use the machine, and requests that you take immediate possession of same. You are also advised that the future payments on this machine will not be paid, and that the Daily News expects a refund of the purchase money already paid.

"The Linograph in question is at the plant of the Daily News at your disposal.

"Very truly yours,

"[Signed] J. E. Wilkinson.

"VLA:SC"

Thereafter, various efforts at compromise and settlement were made, but were unsuccessful, and suit was instituted.

Turning first to the question as to what is the nature and extent of the warranty or warranties contained in the contract of sale, the seller contends that the express guaranty that the machine is "of good mechanical construction" cannot be construed as a warranty of its fitness, efficiency, or performance, but merely as a warranty against defects in construction, and that no further or different warranty is to be implied. Whether this is true depends upon the law of Iowa, which, as we have seen, controls in the interpretation of the present contract.

The Uniform Sales Act was in effect in Iowa at the time this contract was made, and the pertinent provisions are the following:

"1. Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, whether he be the grower or manufacturer or not, there is an implied warranty that the goods shall be reasonably fit for such purpose. * * *

"4. In the case of a contract to sell or a sale of a specified article under its patent or other trade name there is no implied warranty as to its fitness for any particular purpose. * * *

"6. An express warranty or condition does not negative a warranty or condition implied under this chapter unless inconsistent therewith." Iowa Code 1927, § 9944.

The Supreme Court of Iowa has had occasion to construe the first and last of the above-quoted provisions, and in so doing has held that an express warranty, such as the one here, does not exclude an implied warranty that the thing purchased is fit for the particular purpose for which it is to be used; such implied warranty being expressly preserved as it existed at common law. See Petersen v. Dreher, 196 Iowa, 178, 194 N. W. 53; Wise v. Central Iowa Motors Co., 207 Iowa, 939, 223 N. W. 862. See, also, Williston on Sales (2d Ed.) § 239. In the Wise Case, the express warranty was as follows (207 Iowa, 939, 223 N. W. 863): "We warrant each new motor vehicle sold and delivered by us at retail to be free from defects in material and workmanship and agree to replace any part or parts thereof which, under normal and reasonable use and within ninety days after delivery of such motor vehicle to the original retail purchaser, shall prove, upon our examination and to our satisfaction, to have been unsatisfactory for the proper operation of such motor vehicle; in such cases we agree to install the part or parts free of charge to the purchaser." The court said (207 Iowa, 939, 223 N. W. 864):

"Section 9944, upon which plaintiff relied in count 2, contains the following:

"'1. Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, whether he be the grower or manufacturer or not, there is an implied warranty that the goods shall be reasonably fit for such purpose.'

"'6. An express warranty or condition does not negative a warranty or condition implied under this chapter unless inconsistent therewith.'

"It is the contention of the appellant that the express warranty of necessity bars the consideration of an implied warranty. In support of this proposition, reliance is had upon our cases which hold that an express written warranty bars the consideration of an additional oral warranty. These cases are not in point. The question is now controlled by the statute. We had occasion to consider and apply the statute, in Petersen v. Dreher, 196 Iowa, 178, 194 N. W. 53. We had also occasion to consider the state of our holdings prior to the adoption of such statute. Owens Co. v. Leland Farmers' Elevator Co., 192 Iowa, 771, 185 N. W. 590. Our holding in these cases is quite adverse to the contention of appellant."

In the absence of specific findings of fact by the trial judge and of a written opin-

ion in the case at bar, it is not clear from the decree whether the trial judge rested his decision solely upon the conclusion that there had been no breach of warranty, either express or implied, or that, even if there had been, such breach had been waived by the purchaser, or upon both grounds. We should not reverse the finding of the lower court in a proceeding of this kind unless convinced that such conclusion is clearly not supported by the law or testimony. Keeton v. Jefferson Standard Life Insurance Co. (C. C. A.) 5 F.(2d) 183. We feel that the decree must be affirmed if for no other reasons than because of the statements contained in the purchaser's letter of November 18, 1924, and its subsequent acts. That letter was written by Mr. Jasper, editor, who was one of the same officials who signed the original contract of purchase. In it he reviews his company's experience with the machine over a period of more than three months, and states, without any reservation or equivocation, that "it has proved the best investment we have put into our plant. We set about one-half of our straight matter on it and all of our display in our eight page daily." After praising the machine's rapidity of operation and the increased production incident thereto, the letter concludes with the following: "We cannot recommend it too highly for speed, accuracy and efficiency in operation. We can recommend Model 12 to anyone in the market for a versatile machine,—one carrying both display and body matter." Add to this commendation the fact that for an additional ten months, during most of which time the purchaser's company was under new management, making a total of some fourteen months of operation, the purchaser continued to use the machine and to pay the installments due thereon, with interest, without any complaint whatsoever, and we must conclude that there was strong evidence that the machine fulfilled all the requirements of the contract.

█ With respect to the matter of implied warranty, it may be added that on the entire record we incline to the view that the case is one covered by subsection 1 of section 9944 of the Iowa Code above quoted, rather than by subsection 4. These two provisions of the Uniform Sales Act substantially codify the common-law rule, with the exception that subsection 1 substitutes a question of fact for the presumption that the buyer relied on the seller's skill or judgment. Kansas City Bolt & Nut Co. v. Rodd (C. C. A.) 220 F. 750; Williston on Sales (2d Ed.) § 248. Here the purchaser made known to the seller the particular purpose for which the machine was required. To what extent thereafter the buyer relied on the seller's skill or judgment is not clear from the record, but the very character of the machine, the fact that it was a new type not in extensive use, the absence of any prior inspection, the provision in the contract for installation and instruction in operation, all indicate that the purchaser relied, certainly to some extent, upon the seller's judgment in purchasing this particular kind of machine and did not merely purchase it under its patent or trade-name, that is, linograph model 12, as the phrase "patent or other trade-name" is understood in subsection 4. Adopting the view, therefore, that there was an implied warranty that the machine was reasonably fit for the particular purpose for which it was required, namely, setting type, both display and general composition, for the purchaser's daily newspaper, we cannot escape the conclusion, in spite of conflict in the testimony even as between seller's employees, that the weight of the credible evidence clearly indicates that it was reasonably fit and suitable for that purpose, and that, in their last analysis, the difficulties encountered were due rather to lack of skill or training on the part of the purchaser's operator Blackburn than to any inherent shortcomings in the machine itself.

█ We have thus seen that the record affords no ground for holding that there was a breach of warranty. But, assuming that there had been a breach of either the express or implied warranty, the purchaser, in order to avail itself of the right to rescind the contract on such ground, was required to manifest its election so to do without undue delay, otherwise such right was lost. This is expressly provided in the Uniform Sales Act as follows: "Where the goods have been delivered to the buyer, he cannot rescind the sale if he knew of the breach of warranty when he accepted the goods, or if he fails to notify the seller within a reasonable time of the election to rescind. * * *" Iowa Code 1927, § 9998 (3). See Williston on Sales (2d Ed.) § 611, and cases cited. Here the purchaser waited fourteen months before making any complaint whatsoever, during all of which time it used the machine, continued to pay for it, and, after it had been in operation for more than three months, wrote the letter of November 18, 1924, praising it unqualifiedly. In this connection the cross-examination of the new president of the company, Mr. Ingersoll, is significant, because it discloses what appears to be the primary motive underlying

the belated attempt to rescind the contract and return the machine. He admitted that in December, 1925, while talking to Mr. Ziegler, he told the latter, "We were waiting for it to be removed, that it was not practicable for an office of the size we had, that we had purchased another machine, and that the reason we did not keep operators for the No. 12 was because we did not want it, and that when it came to a law suit we would get as much out of it as a Linotype machine."

For the aforegoing reasons we find no error in the action of the trial judge, and the decree is accordingly affirmed.